**Marie N. ABBOTT, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 3:96–CV–510.**

United States District Court, N.D. New York.

Dec. 3, 1999.

---

O'Connor, Gacioch & Pope, Binghamton, NY, Thomas F. O'Connor, of counsel, Ball Janik LLP, Portland, OR, for plaintiffs, James T. McDermott, Neil D. Kimmelfield, of counsel.

Daniel J. French, United States Attorney for the Northern District of New York, Syracuse, NY, William H. Pease, Assistant U.S. Attorney, of counsel, United States Department of Justice, Tax Division, Washington, DC, for defendant, Alan Shapiro, D. Patrick Mullarkey, of counsel.

## MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

Plaintiffs brought the instant action seeking a refund of all or a portion of the

federal income and social security employment taxes paid by them when they received lump sum payments from their employer, International Business Machines Corporation ("IBM"), at the time of their separation from IBM's employ. A previous motion to dismiss brought by the defendant United States was denied without prejudice to renew after the completion of discovery.

There are 737 named plaintiffs in this action, and that number was expected to increase to over 800 [1]. Thus, in order to streamline the discovery phase of this action, the parties agreed to and the undersigned, in the prior capacity of magistrate judge, ordered that plaintiffs designate one representative plaintiff. The representative plaintiff must have received a payment from IBM, experienced no symptoms of physical or emotional harm, nor asserted or threatened any claim against IBM, and not communicated with IBM regarding his or her injuries or claims, prior to signing a General Release and Covenant Not To Sue ("Release") and receiving a payment from IBM. Complete discovery was then to be permitted as to the representative plaintiff.

Additionally, plaintiffs were required to stipulate that if the defendant was ultimately successful on a motion dispositive of liability as against the representative plaintiff, all plaintiffs in the action agreed to withdraw the complaint in its entirety, with prejudice. On the other hand, if the plaintiffs were successful on a motion dispositive of liability with regard to the representative plaintiff, including appeals, the parties would be permitted complete discovery as to all plaintiffs.

Plaintiffs selected one Ernest N. Miles [2] ("Miles") as their representative plaintiff. Plaintiffs certified that prior to signing a

Release and receiving his payment from IBM, Miles did not experience symptoms of physical or emotional harm, did not assert or threaten any claim against IBM, and did not communicate with IBM regarding his injuries or claims. Plaintiffs did stipulate that, if defendant were successful on a dispositive motion as to liability to Miles, all claims would be withdrawn with prejudice. Complete discovery was then taken by the parties relating to Miles. The parties also proceeded with open discovery of non-party IBM, with regard to any and all plaintiffs.

## II. PROCEDURAL POSTURE

On June 29, 1998, defendant filed a motion in limine to preclude the testimony at trial of Dr. H. Michael Peter. On June 30, 1998, the defendant filed two additional motions in limine to preclude the testimony at trial of plaintiffs' legal expert Richard Reibstein, Esq. and to preclude the use of certain documents. Plaintiffs oppose the motions in limine.

On March 5, 1999, plaintiffs filed a motion for summary judgment package pursuant to Local Rule 7.1(b)(1) that included defendant's opposition to the motion as well as plaintiffs' reply. Also on March 5, 1999, defendant filed a motion for summary judgment package pursuant to Local Rule 7.1(b)(1) that included plaintiffs' opposition as well as its reply. Further, defendant filed a motion to strike certain testimony and documents in the event a trial takes place. Plaintiffs oppose the motion to strike.

Oral argument on these motions was heard on June 15, 1999, in Utica, New York. Decision was reserved.

---

**1.** While plaintiffs do not state a total amount of refunds sought, it appears as though the refunds at issue in this case approach $15 million, plus interest.

**2.** Ernest N. Miles and Betty J. Miles, his wife, were named as the representative plaintiffs

because they filed a joint income tax return for 1992, the tax year in question. The presence of Mrs. Miles as a co-plaintiff is irrelevant to the issues presently at hand and therefore will be ignored for the purposes of simplification.

## III. FACTS

Following are the undisputed facts as set forth by the parties. Only detail sufficient for determination of the pending motions is set forth.

During the late 1980's and early 1990's, the computer market move away from centralized mainframe computers resulted in IBM changing its product mix, reallocating employee resources, and generally downsizing. In the fall of 1991 IBM changed the method by which it evaluated employees, resulting in stricter scrutiny and lower overall performance evaluations. IBM used the performance evaluations as part of the criteria in making downsizing determinations. In addition to retraining and redeploying employee resources, in 1990 through 1996 IBM operated both voluntary and involuntary downsizing programs. The primary purpose for the downsizing programs was not to obtain waivers of claims from employees nor to compensate or settle personal injury or any other tort claims of employees. IBM designated the employees eligible to participate in the downsizing programs based upon a determination of surplusage in specific skills or positions.

The downsizing programs were essentially an incentive for employees to terminate their employment with IBM, either through resignation, pre-retirement leave of absence, or early retirement. IBM provided a lump sum payment calculated based upon years of service and salary at the time of termination. IBM withheld income and employment taxes from all lump sum payments made under its downsizing programs. As a condition of participation in a downsizing program, IBM required employees to sign a Release.[3] IBM notified employees that if the voluntary

---

3. Following is the text of the Release:

GENERAL RELEASE AND COVENANT NOT TO SUE

. . . . .

IBM ADVISES YOU TO CONSULT AN ATTORNEY BEFORE YOU SIGN THIS RELEASE

If you feel that you are being coerced to sign this release or that your signing would for any reason not be voluntary, or you believe the process by which you have been offered this release or the payment in exchange for this release is discriminatory,[1] you are encouraged to discuss this with your management or Personnel before signing this release. After reviewing the release with your attorney, you can discuss concerns you have with your manager or your attorney can contact legal counsel at your location. You should thoroughly review and understand the effects of the release before signing it.

In exchange for the sums and benefits which you will receive pursuant to the terms of the Modified and Extended Individual Transition Option Program (ITO II Program), (Name of Individual) (hereinafter "you") agrees to release International Business Machines Corporation (hereinafter "IBM") from all claims, demands, actions or liabilities you may have against IBM of whatever kind, including but not limited to those which are related to your employment with IBM or the termination of that employment. You agree that this also releases from liability IBM's agents, directors, officer, employees, representatives, successors and assigns (hereinafter "those associated with IBM"). You agree that you have executed this release on your own behalf, and also on behalf of any heirs, agents, representatives, successors and assigns that you may have now or in the future. You also agree that this release covers, but is not limited to, claims arising from the Age Discrimination in Employment Act of 1967, as amended, Title VII of the Civil rights Act of 1964, as amended, and any other federal or state law dealing with discrimination in employment on the basis of sex, race, national origin, religion, disability, or age. You also agree that this release includes claims based in theories of contract or tort, whether based on common law or otherwise. This release does not include your vested rights, if any, in the IBM Retirement Plan, which survive unaffected by this release.

1. The Age Discrimination in Employment Act prohibits employment discrimination based on age and is enforced by the Equal Employment Opportunity Commission (EEOC). Other federal laws prohibit discrimination in employment based on sex, race, color, national origin, religion, handicap, or veteran status. These laws are enforced by the EEOC and the U.S. Department of Labor. There are also state and local laws prohibiting discrimination, which are enforced by state and local human rights agencies.

IBM Dep.Ex. 2 at PL00045.

downsizing programs did not have sufficient participation, involuntary actions would be taken to effect the necessary downsizing.

During the period when downsizing was occurring, IBM was aware of discontent among some employees due to the new method of evaluating performance and the downsizing programs. IBM was also aware that some employees were emotionally injured due to the downsizing. IBM knew that some employees believed IBM had breached an implied contract with them, had discriminated against them on account of age, race, religion, or other individual characteristics in the manner in which the downsizing took place, or had arbitrarily given them low performance evaluations to induce them to participate in voluntary downsizing programs. IBM believed that some employees would file contract and or tort lawsuits against it relating to its performance evaluation and downsizing programs. Due to this concern about litigation, IBM designed a broad general release form and required employees to sign the Release in order to participate in a. voluntary program.

Miles, who was educated as an electrical engineer, commenced his career with IBM on March 31, 1964. He was employed at IBM's Endicott, New York, facility. During the 1980's Miles worked in a department referred to as packaging, working on equipment used to test circuit cards and boards. In the late 1980's IBM informed Miles and other employees that their performance and productivity would have to increase in order to maintain the same level evaluation. In 1989 and thereafter Miles received a performance level at his evaluation that put him at risk for adverse action. In April 1989 Miles requested and received a transfer to programming, a department in need of employees with programming skills. Miles took instruction in programming at IBM-taught classes and received on-the-job training in the programming department. Although Miles was an entry-level programmer, he retained his previous salary level. Accordingly, he was evaluated against experienced programmers. Consequently, he continued to receive poor performance evaluations. At his request, in August 1991 Miles transferred back to packaging. In November 1991 Miles was given another poor evaluation.

In the fall or winter of 1991 IBM released to employees, including Miles, information pertaining to a downsizing program. In January 1992 Miles received an additional poor evaluation. At that time he was told that within thirty days he would be given the poorest possible performance level, making him ineligible for participation in any downsizing program but subjecting him to involuntary termination. It was also suggested to Miles that he consider participation in the currently-available voluntary downsizing program. On February 10, 1992, Miles submitted his application to participate in the downsizing program. His employment with IBM terminated on July 31, 1992. At that time Miles was sixty years of age and had been employed by IBM for twenty-eight years.

Miles believes that he was unfairly forced to terminate his employment with IBM. He also believes that characterizing him as a poor performer damaged his work reputation. However, as of July 31, 1992, Miles did not suffer any physical illness or emotional injury as a result of his poor performance evaluations and the offerings of various downsizing programs between 1988 and 1992. Miles considered the lump sum payment as compensation for lost income he would have earned if he had worked until 1996 then retired, at age 65. He also considered the payment as compensation for what he perceived as unfair performance evaluations during his last few years of employment with IBM and for signing the Release.

At the time that he signed the Release, Miles felt that any rights that he had to sue IBM were worthless, such that it was a good opportunity to give up any such rights in exchange for the lump sum pay-

ment. However, he was not anxious to leave his employment with IBM, and would not have left if he felt he truly had a choice. On July 31, 1992, Miles' last day of work, he signed a Release and received his lump sum payment of $46,023.00 less taxes withheld, along with the tax withholding statement. The tax withholding statement reflected $11,291.00 withheld for income tax and $2,092.00 for social security employment tax, amounts that IBM paid to the Internal Revenue Service ("IRS"). Miles duly filed a tax return for the 1992 tax year, including the lump sum payment of $46,023.00 as wages or salary. On January 25, 1995, Miles sought a refund of the taxes withheld from the IRS. On April 18, 1995, the IRS disallowed Miles' refund. Miles now is participating in this action, timely filed on March 28, 1996, against the United States to secure such refund from the IRS.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.

R.Civ.P. 56; *Liberty Lobby, Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. At that point the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Moreover, where the nonmovant has the burden of proof at trial, the moving party can meet its initial burden by demonstrating the absence of evidence in support of an essential element of the nonmovant's claim. *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 270 (1999). Once that initial burden is met, the non-movant must adduce some evidence supporting the essential elements of its claim. *See id.* at 271–72.

### B. Income Tax

An income tax is imposed upon taxable income. I.R.C. § 1. Taxable income is gross income minus any permitted deductions (other than the standard deduction). § 63. Gross income is "all income from whatever source derived." § 61. Excluded from gross income is "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness." § 104(a)(2) (1988) (amended 1996[4]). Inclusions in income must be broadly construed, while exclusions from income must be narrowly construed. *Commissioner v. Schleier*, 515 U.S. 323, 327–28, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995); *Taggi v. United States*, 35 F.3d 93, 95 (2d Cir.1994). More-

---

4. The text of this section was subsequently amended to exclude damages received "on account of personal physical injuries or physical sickness." I.R.C. § 104(a)(2) (1999 Supp.) This amendment, however, is inapplicable where, as here, the payment in question was made before August 20, 1996, the date of enactment. Pub.L. 104–188 § 1605(d)(1).

over, the burden of proving that a claim falls within an exclusionary provision rests upon the party claiming the exclusion. *Taggi*, 35 F.3d at 95.

 In order to be excluded from income pursuant to § 104(a)(2), two requirements must be met. *Schleier*, 515 U.S. at 337, 115 S.Ct. 2159. First, the recovery must have been for damages (whether by suit or agreement) based upon an underlying tort or tort type cause of action. *Id.* "The term 'damages received (whether by suit or agreement)' means an amount received (other than workmen's compensation) through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." *Taggi*, 35 F.3d at 95 (quoting 25 C.F.R. § 1.104–1(c)). Thus, where no lawsuit was brought, it must be shown that the settlement agreement was reached in lieu of prosecution of such suit. *See id.* As used in determining exclusion from taxable income, "it is imperative that a 'settlement agreement' involve a bona fide dispute. This prevents the use of a contrived 'settlement' designed to avoid taxation of the proceeds." *Id.* at 96. Where the language of a settlement agreement is unclear or ambiguous on the issue of whether the payment is severance pay or in settlement of a legal claim, the intent of the employer in making the payment is determinative. *Agar v. Commissioner*, 290 F.2d 283, 284 (2d Cir.1961).

In addition to settling a bona fide dispute, the underlying action must be tort or tort like. Availability of compensatory damages is a hallmark in determining whether the underlying cause of action is tort or tort like. *Schleier*, 515 U.S. at 335, 115 S.Ct. 2159. Traditional intangible harms such as emotional distress, pain and suffering, and reputational damage are recompensed by way of a tort or tort like suit. *Id.* at 335–36, 115 S.Ct. 2159 (quoting *United States v. Burke*, 504 U.S. 229, 239, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992)). Thus, an action may be characterized as

tort or tort like where available damages compensate for the personal injury, including consequential damages such as emotional distress. *Id.* at 336, 115 S.Ct. 2159.

Second, the damages must have been received on account of personal injuries or sickness. *Id.* at 337, 115 S.Ct. 2159. In order to be considered "received on account of personal injuries," damages must be attributable to the injury. In other words, there must be a link between the personal injury and the amount of damages. *Id.* at 330, 115 S.Ct. 2159.

██ Plaintiffs argue that the lump sum payment made by IBM to Miles, as representative plaintiff, is excluded, at least in part, pursuant to I.R.C. § 104(a)(2), from taxable income as damages received by settlement of claims for personal injuries. Defendant, however, points out that no evidence brings Miles' payment under the exception. Accordingly, in order to withstand summary judgment in the face of defendants' demonstration that no evidence supports an exception, plaintiffs must adduce some evidence that the payment Miles received from IBM is excludable from income pursuant to section 104(a)(2), as set forth above. *See Ginsberg*, 189 F.3d at 270–72. Scrutiny of the undisputed facts leads to the inexorable conclusion that Miles' payment does not fall within the exclusion of section 104(a)(2).

First, Miles' payment was not damages received by a settlement of any underlying tort or tort type cause of action. *See Taggi*, 35 F.3d at 95. Plaintiffs seek to characterize the payment and signing of the Release as a settlement of personal injury claims. The agreement reached between Miles and IBM arose out of a business downsizing, or reduction in force, conducted by IBM. There was no bona fide dispute between IBM and Miles regarding personal injuries suffered by Miles. *See id.* Miles was unaware, at the time he signed the Release and received the payment, that he had suffered, or was suffer-

ing, from personal injuries. Miles had not notified IBM nor communicated with it in any way regarding any symptoms of physical or emotional harm he suffered. Miles had not asserted or threatened any claim against IBM. Plaintiffs have adduced no facts that an underlying bona fide tort or tort type claim existed. Accordingly, it cannot be said that the payment in exchange for the Release in any way constituted settlement of a personal injury claim. *See id.* at 95–96; *Abrahamsen v. United States,* 44 Fed.Cl. 260, 269 (Fed.Cl.1999).

Plaintiffs posit that the testimony of their medical expert, Dr. H. Michael Peter ("Dr.Peter"), shows that Miles did in fact suffer from an injury prior to signing the Release. Defendant has moved to preclude this testimony. For the purposes of the summary judgment motions defendant's motion is denied and Dr. Peter's testimony is accepted. However, in the event that this case proceeds to trial, defendant may request that this issue be revisited. Accepting Dr. Peter's testimony that Miles suffered from emotional injuries of which he was and is unaware does not help plaintiffs' position. Even if Miles did suffer such injury, since he and IBM were both unaware that such injuries existed, then they could not enter into a settlement of claims regarding the injuries. In other words, on July 31, 1992, the parties could not settle a claim that neither knew to exist.

Plaintiffs point to IBM testimony that it recognized the possibility that some disgruntled employees who were separated from employment in the downsizing programs might file suit against it in support of their averment that IBM's intent in making the payments was to settle legal claims. More specifically, plaintiffs argue that the legal claims for which IBM was at risk were tort claims. In support of this argument they proffer the expert testimony of Richard Reibstein, Esq. ("Reibstein"). Reibstein posits that evaluation of employment downsizing programs led to the determination that employers faced a

risk of suit from terminated employees. Of the risk faced, 95 percent of the risk is attributable to tort claims, while 5 percent of the risk would be for contract or other non-tort claims, according to Reibstein. Plaintiffs aver that this testimony shows that IBM intended to settle tort claims with the payments and Release.

Defendant also moved to preclude the Reibstein testimony. Again, for the purposes of the summary judgment motions, this motion is also denied and the testimony will be considered. Again, in the event this matter goes to trial, defendant may renew its preclusion motion.

Accepting Reibstein's testimony that IBM faced a risk of lawsuits from former employees, and that 95 percent of that risk would be tort based, is unavailing to plaintiffs' argument. IBM acknowledges that it faced a risk of lawsuits and some of that risk involved tort claims. IBM required employees participating in a downsizing program, including Miles, to sign a Release in order to protect itself from such lawsuits. In addition IBM made the payments to maintain the good will of employees and the community. These undisputed facts do not lead to the conclusion that IBM intended the payment to Miles to settle an underlying tort claim.

IBM's recognition of tort risk does not make a tort claim for Miles. This is true particularly in light of Miles' complete lack of any symptoms of injury, his failure to assert or threaten any claim against IBM, and his complete lack of communication with IBM regarding any injury or claim. Recognition of a general risk of tort claims led IBM to require employees to sign a Release in order to receive a lump sum payment. IBM cannot be said to have intended to settle a tort claim of Miles, or any other employee, when it did not know that any such claim existed. Reibstein's testimony regarding IBM's tort risk does not provide evidence that Miles' lump sum payment was in whole or in part made as a settlement of a claim for personal injuries.

Second, the payment Miles received was not on account of personal injuries or sickness. *See Schleier,* 515 U.S. at 336, 115 S.Ct. 2159. The payment was calculated based upon Miles' years of service and salary, and was in no way linked to any personal injuries he may have suffered. *See id.* at 330, 115 S.Ct. 2159. Again accepting Dr. Peter's testimony for purposes of this motion, it cannot be said that Miles received the payment on account of personal injuries he did not know he had. The payment was exclusively linked to Miles' employment with IBM. Plaintiffs have adduced no facts even suggesting that the payment Miles received on July 31, 1992, was attributable to a personal injury he actually suffered. *See id.; Abrahamsen,* 44 Fed.Cl. at 270.

Defendant has met its initial burden of pointing out an absence of evidence to support plaintiffs' claim that Miles' payment falls under the section 104(a)(2) exception. Plaintiffs have failed to meet their burden of setting forth some evidence that the lump sum payment made to Miles was excludable from taxable income pursuant to section 104(a)(2). Based upon the undisputed facts, defendant has established its entitlement to judgment dismissing Miles claim for an income tax refund.

### C. Social Security Employment Tax

Wages, or "all remuneration for employment," are subject to employment taxes to fund social security programs. 26 U.S.C.A. § 3121(a) (1999 Supp.). Employment is "any service, of whatever nature, performed" by an employee for an employer. § 3121(b). Service means "not only work actually done but the entire employer-employee relationship for which compensation is paid to the employee by the employer." *Social Security Bd. v. Nierotko,* 327 U.S. 358, 365–66, 66 S.Ct. 637, 90 L.Ed. 718 (1946). Given the purpose of the social security system, the statute must be interpreted to provide broad coverage. *Id.* at 365, 66 S.Ct. 637.

Plaintiffs contend that the payment made to Miles is not subject to the employment tax because it was not made in exchange for services. However, the payments were made by IBM, as employer, to Miles its employee. The payment amount was calculated based upon Miles' employment with IBM, using a formula taking into account Miles' years of service and salary. The payment must be considered as compensation within the employment relationship, although not for work actually done. *See Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637; *Abrahamsen,* 44 Fed.Cl. at 272. Accordingly, the payment Miles received from IBM is subject to the social security employment tax and he is not entitled to a refund. Defendant is entitled to summary judgment on this claim. *See Nierotko,* 327 U.S. at 365–66, 66 S.Ct. 637; *Abrahamsen,* 44 Fed.Cl. at 272.

## IV. CONCLUSION

The testimony of Dr. Peters and Reibstein is accepted for the purposes of determining the summary judgment motions, but may be revisited if a trial in this matter occurs. Defendant's other evidentiary motions are denied as moot.

The payment made to Miles by IBM does not fall within the exception for settlement of personal injury claims set forth by section 104(a)(2). Therefore the payment is subject to income tax. Further, the payment falls within the broad coverage of the term wages for the purposes of social security employment taxes. There being no genuine issue of material facts, defendant is entitled to judgment as a matter of law. Based upon the stipulation of plaintiffs to withdraw all claims should summary judgment be decided adversely to Miles, the complaint will be dismissed in its entirety. Accordingly, it is

ORDERED that

1. Plaintiffs' motion for summary judgment is DENIED;

2. Defendant's motions to preclude the testimony of Dr. Peter and Reibstein are

DENIED without prejudice to renew in the event of trial and defendant's remaining evidentiary motions are DENIED as moot; and

3. Defendant's motion for summary judgment is GRANTED; and the complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment accordingly.

IT IS SO ORDERED.